**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| United National Insurance Company,<br><br>Plaintiff<br><br>vs.<br><br>Assurance Company of America, et al.,<br><br>Defendants | Case No.: 10-cv-1086-JAD-NJK<br><br>**Order Denying United National's<br>Motion for Summary Judgment**<br><br>[ECF 192] |

Plaintiff United National Insurance Company moves for summary judgment in this pie-divvying contest in which defendants Assurance Company of America and Maryland Casualty Company (collectively "Zurich") rely on "anti-stacking" provisions in three insurance policies to limit Zurich's share of the liability for the settlement of the Seneca Falls construction-defect lawsuit.[1] I find that the Zurich policies are not void as a matter of public policy nor subject to any special presentation requirements under Nevada law; instead, the anti-stacking provisions are unambiguous under ordinary contract-interpretation principles. I also find on this record that there were four "occurrences" that caused property damage to the homes in the Seneca Falls development for the purposes of insurance liability. But because I conclude that the question of when the property damage occurred leaves disputed issues of material fact, I ultimately deny United National's motion for summary judgment.

**Background**

This case presents the question of whether two insurers paid their fair share to settle a construction-defect lawsuit. United National and Zurich each issued insurance policies to R.B. Petersen & Sons Construction Co., Inc. (R.B. Petersen), a grading and paving contractor. The

---

[1] ECF 192.

1  policies purportedly covered R.B. Petersen's work on the Seneca Falls development.[2]  Between 1999

2  and 2001, R.B. Petersen's work on this project was governed by six written proposals, which

3  delineated several different types of work: over-excavation, grading, sub-grading for curbs and

4  streets, fine grading, compacting, filling, curb construction, paving, importing soil, importing gravel,

5  and placing gravel.[3]

6  **A.      Zurich's policies**

7         Zurich issued three one-year primary commercial general-liability (CGL) insurance policies

8  to R.B. Petersen covering policy periods beginning on July 31, 2001, and ending on July 31, 2003.[4]

9  Each of Zurich's three CGL policies contains the same insuring clause language:

> a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages. . . .
>
> (1) The amount we will pay for damages is limited as described in LIMITS OF INSURANCE (SECTION III); and
>
> (2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.
>
> * * *
>
> b. This insurance applies to "bodily injury" and "property damage" only if . . . (2) The "bodily injury" or "property damage" occurs during the policy period.[5]

20  Zurich's policies define "property damage" as "[p]hysical injury to tangible property, including all

21  resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the

22  physical injury that caused it. . . ."[6]

---

[2] ECF 8 (Zurich was a primary insurer while United National was an excess insurer).

[3] *See* ECF 192-16 at 2–16; ECF 192-20 at 2–14; ECF 192-33 at 3 ¶¶ 3–4 and 5–14.

[4] ECF 192-4–192-6 (policy period of 7/31/2000 to 7/31/2001); ECF 192-7–192-11 (policy period of 7/31/2001 to 7/31/2002); ECF 192-12–192-15 (policy period of 7/31/2002 to 7/31/2003).

[5] ECF 192-5 at 35; ECF 192-10 at 7; ECF 192-14 at 16.

[6] ECF 192-6 at 14; ECF 192-11 at 4; ECF 192-15 at 8.

2

Zurich's policies limit coverage in numerous ways, including:

> The limits of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months.  In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.[7]

Finally, and most critically, the policies contain "anti-stacking" provisions that set out conditions where liability is capped:

> **Two or More Coverage Forms or Policies Issued By Us**
>
> If this Coverage Form and any other Coverage Form or policy issued to you by us or any company affiliated with us apply to the same "occurrence," the maximum Limit of Insurance under all the Coverage Forms or policies shall not exceed the highest applicable Limit of Insurance under any one Coverage Form or policy. This condition does not apply to any Coverage Form or policy issued by us or an affiliated company specifically to apply as excess insurance over this Coverage Form.[8]

Zurich's policies define "occurrence" to mean "an accident, including continuing or repeated exposure to substantially the same general harmful conditions."[9]  The anti-stacking provisions are not mentioned in the policies' declarations pages or insurance clauses.  Nor are they referenced in the "limits of insurance" section.  R.B. Petersen's president, Richard Petersen, attests that he was unaware of Zurich's anti-stacking provision when he purchased each of the three Zurich policies.[10]

**B.    The underlying construction-defect litigation**

R.B. Petersen was added as a third-party defendant in the underlying construction-defect litigation in October 2006.[11]  After amendments, the complaint alleged claims of 124 homeowners in

---

[7] ECF 192-6 at 9; ECF 192-10 at 17; ECF 192-15 at 3.

[8] ECF 192-6 at 11; ECF 192-10 at 19; ECF 192-15 at 5.

[9] ECF 192-6 at 13; ECF 192-11 at 3; ECF 192-15 at 7.

[10] ECF 102-29 at 2 ¶ 7.

[11] *See* ECF 192-23.

122 Seneca Falls homes purchased between August 22, 2000, and May 15, 2003.[12]  In their third amended complaint, the homeowners alleged that R.B. Petersen "provided rough grading and earthwork services" and that "the nature and scope of construction defects include but may not be limited to, improperly placed or compacted soils, improperly designed or constructed walkways, driveways, slabs, pads, foundations, exterior masonry site retaining/fence walls, and landscape."[13] Throughout that litigation, there were allegations that R.B. Petersen caused damages by (1) failing to over-excavate to a proper depth, (2) failing to provide a gravel base at home sites, (3) using expansive and/or corrosive soils in its fill material, (4) improperly compacting slab sites, and (5) using oversized fill materials.[14]

Zurich agreed to provide R.B. Petersen with a defense, and its January 3, 2007, reservation-of-rights letter noted potential liability under all three Zurich policies.[15]  On November 7, 2007, Zurich reserved the right to assert the $1 million coverage limitations.[16]  In April 2008, R.B. Petersen instructed its attorneys to settle the case.[17]  After R.B. Petersen and its attorneys agreed that the case should be settled, the litigants agreed to a $2,553,000 settlement.  Zurich contended that the anti-stacking provisions in its policies capped its settlement liability at $1,000,000,[18] but it eventually paid $1,353,000 towards the settlement.[19]  Two of R.B. Petersen's excess insurers made up the difference—with United National paying $900,000.[20]

---

[12] *See* ECF 192-3.

[13] ECF 192-24 at 13 ¶ 8, 16 ¶ 20.

[14] ECF 192-31 at 3–4 ¶ 6; *see* ECF 192-32 at 6–7 ¶ 16.

[15] ECF 192-25.

[16] ECF 192-26.

[17] ECF 192-21 at 3 ¶ 7; ECF 192-21 at 7.

[18] ECF 192-21 at 3 ¶ 8; ECF 192-21 at 9–10.

[19] ECF 193-13.

[20] ECF 192-21 at 4 ¶ 10.

**C.    Procedural posture of the current litigation**

United National then sued Zurich in this action seeking equitable contribution (Count 1), equitable subrogation (Count 2), and a declaration that Zurich is obligated to indemnify R.B. Petersen under all three of its insurance policies (Count 3).[21]  United National now moves for summary judgment against Zurich on all of its claims.[22]

Zurich opposes the motion on its merits and claims that United National's motion is defective because it fails to specify which cause or causes of action it seeks the court to summarily decide, making this motion susceptible to automatic denial under Rules 7(b) and 56(a).[23] Rule 7(b) generally requires requests for court orders to "state with particularity the grounds for seeking the order" as well as the relief sought; Rule 56(a) requires the summary judgment movant to identify the claims, defenses, or the portion of either on which summary judgment is sought.  While I agree that United National's motion is not a paragon of clarity, I note that Zurich has been able to identify the equitable-subrogation claim as the target of United National's motion and offer a number of responsive arguments,[24] so it does not appear that Zurich has been prejudiced by any confusion.[25] Thus, I consider United National's motion as one seeking summary judgment on its equitable-subrogation claim.  United National's arguments also implicate its declaratory-relief claim and Zurich's 13th affirmative defense regarding its anti-stacking provision.  However, I do not consider United National's equitable-contribution claim.

---

[21] ECF 8 at 4–7.

[22] This is a renewed motion for summary judgment.  I denied United National's prior version of this motion without prejudice and with instructions for refiling.  *See* ECF 157, 191.

[23] ECF 193 at 16–17 (citing *Rhodes v. Robinson*, 399 F. App'x 160, 2010 WL 3516342, at *2 (9th Cir. Sept. 8, 2010) (unpublished)).

[24] *See* ECF 193 at 17–19.

[25] ECF 194 at 5.

### Discussion

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."[26]  The burdens on summary judgment are key.  A party seeking summary judgment bears the initial burden of informing the court of those portions of the pleadings and discovery that demonstrate the absence of a genuine issue of material fact.[27]  "A genuine dispute arises if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[28]  If reasonable minds could differ on the material facts at issue, summary judgment is not appropriate because the purpose of summary judgment is to avoid unnecessary trials when the facts are undisputed.[29]  A party seeking to either support or refute the assertion that a fact is genuinely in dispute must do so with admissible evidence.[30]

Parties moving for summary judgment must satisfy Rule 56 of the Federal Rules of Civil Procedure.  Subsection (c)(1) of that rule states, "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."[31]  "If the moving party has not fully discharged this initial burden of production, its motion for summary judgment must be denied, and the Court need not consider

---

[26] FED. R. CIV. PROC. 56(a).

[27] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[28] *California v. Campbell*, 319 F.3d 1161, 1166 (9th Cir. 2003); *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000) ("There must be enough doubt for a 'reasonable trier of fact' to find for plaintiffs in order to defeat the summary judgment motion.").

[29] *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995); *Nw. Motorcycle Assn. v. U.S. Dept. of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).

[30] FED. R. CIV. PROC. 56(c)(1); Fed. R. Evid. 901; *Orr v. Bank of Am.*, 285 F.3d 764, 773 (9th Cir. 2002).

[31] FED. R. CIV. PROC. 56(c)(1).

1    whether the moving party has met its ultimate burden of persuasion."[32]

2          When the moving party meets its initial burden on a summary-judgment motion, the "burden

3    then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for

4    trial."[33]  This means that the nonmoving party "must do more than simply show that there is some

5    metaphysical doubt as to the material facts."[34]  The nonmoving party may not rely on the mere

6    allegations in the pleadings and instead "'must set forth specific facts showing that there is a genuine

7    issue for trial.'"[35]

8

**A.**     **Zurich's anti-stacking provision is unambiguous and does not confound R.B. Petersen's**

9             **reasonable expectations.**

10          United National's most critical argument centers on how the Zurich anti-stacking provisions

11    should be interpreted under Nevada law.  United National requests that I apply to these *CGL* policies

12    Nevada's anti-stacking law for *uninsured- and uninsured-motorist coverage in automobile* policies,

13    codified at NRS 687B.145, which contains these special conditions and limitations:

> Any policy of insurance or endorsement providing coverage under the provisions of NRS 690B.020 or other policy of casualty insurance may provide that if the insured has coverage available to the insured under more than one policy or provision of coverage, any recovery or benefits may equal but not exceed the higher of the applicable limits of the respective coverages, and the recovery or benefits must be prorated between the applicable coverages in the proportion that their respective limits bear to the aggregate of their limits. Any provision which limits benefits pursuant to this section must be in clear language and be prominently displayed in the policy, binder or endorsement. Any limiting provision is void if the named insured has purchased separate coverage on the same risk and has paid a premium calculated for full reimbursement under that coverage.[36]

---

[32] *Id.*

[33] *Miller v. Glenn Miller Prod., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006).

[34] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (footnote omitted).

[35] *Porter v. Cal. Dept. of Corr.*, 419 F.3d 885, 891 (9th Cir. 2004) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)).

[36] Nevada courts have found that, to be enforceable, anti-stacking provisions falling under NRS 687B.145 must satisfy a three-part conjunctive test requiring the clause be expressed in clear language, prominently displayed, and that the insured must not have purchased separate coverage on the same risk nor paid a premium calculated for full reimbursement under that coverage.  *Neumann v. Standard Fire Ins. Co. of Hartford*, 699 P.2d 101, 103 (Nev. 1985) (interpreting NRS 687B.145).

I decline to extend this provision to CGL policies. The statute's title refers particularly to "provisions in policies of casualty insurance" and "uninsured and underinsured motorist coverage," but never references commercial-general-liability policies. "The preeminent canon of statutory interpretation requires [me] to presume that the legislature says in a statute what it means and means in a statute what it says there."[37] Unsurprisingly, Nevada courts have never applied NRS 687B.145 to an anti-stacking provision in a CGL policy,[38] and I find that extending this narrowly crafted provision in the manner United National requests would result in an uninvited expansion of Nevada law.

Instead, I consider whether the anti-stacking provision is enforceable under ordinary insurance-interpretation principles. Insurance policies are contracts of adhesion, and their language "is broadly interpreted in order to afford the greatest possible coverage to the insured."[39] An insurance policy may only restrict coverage if the policy's language "clearly and distinctly communicates to the insured the nature of the limitation," with ambiguities construed against the insurer and in favor of the insured.[40] Nevertheless, courts interpret the policy language according to its plain and ordinary meaning and "will not rewrite contract provisions that are otherwise unambiguous . . . [or] increase an obligation to the insured [that] was intentionally and unabiguously limited by the parties."[41] Restrictions on policy coverage must be explicit. When the facts of an insurance case are not in dispute, insurance-contract interpretation is a question of law that the court may decide on summary judgment.[42]

---

[37] *Building Energetix Corp. v. EHE, LP*, 294 P.3d 1228, 1232 (Nev. 2013) (formatting altered) (internal quotations omitted).

[38] *Cf. Farmers Ins. Group v. Stonik*, 867 P.2d 389, 392 (Nev. 1994) ("[T]he clause at issue in this appeal deals with liability coverage and is not specifically governed by the requirements of a Nevada statute.").

[39] *Id.* at 391 (quotation omitted).

[40] *Vitale v. Jefferson Ins. Co.*, 5 P.3d 1054, 1057 (Nev. 2000); *Sullivan v. Dairyland Ins. Co.*, 649 P.2d 1357, 1358 (Nev. 1982); *see Farmers Ins. Group*, 867 P.2d at 390 (noting Nevada's common-law prohibition against stacking liability insurance).

[41] *Vitale*, 5 P.3d at 1057.

[42] *Federal Ins. Co. v. Am. Hardware Mut. Ins. Co.*, 184 P.3d 390, 392 (Nev. 2008).

8

Applying these ordinary insurance-interpretation principles, I find the anti-stacking provision is unambiguous. Other states acknowledge the enforceability of anti-stacking provisions in CGL policies, noting that an insured "generally may stack policies unless limited by . . . a valid policy provision."[43] A district court in New Mexico, for example, found that, while New Mexico, like Nevada, permitted "stacking" of uninsured motorists insurance, it had never considered "stacking" when applied to a CGL policy.[44] Citing cases from various jurisdictions, the court accepted the possibility that CGL-policy stacking might be permissible, but it found no language in the policies before the court that allowed them to be stacked.[45]

Even more compelling is *Certain Underwriters at Lloyd's London v. Valiant Ins. Co.*, in which the Washington Court of Appeals interpreted a Zurich anti-stacking policy identical to the one currently before me.[46] The court found the anti-stacking policy unambiguous, enforceable, and not void as a matter of public policy.[47] I follow a similar course here and arrive at the same conclusion.

"The question of whether an insurance policy is ambiguous turns on whether it creates a reasonable expectation of coverage as drafted."[48] I start by interpreting the term "occurrence" because Zurich's anti-stacking provisions apply when two or more of its policies cover "the same 'occurrence.'"[49] Nevada courts have defined "occurrence" as an act that "caused" the resulting injury, noting that "courts ask if there is 'but one proximate, uninterrupted, and continuing cause

---

[43] *See e.g. Beaufort County School Dist. v. United Nat. Ins. Co.*, 709 S.E.2d 85, 97 (S.C. App. 2011) (considering application of stacking principles in connection with CGL policy); *Certain Underwriters at Lloyd's London v. Valiant Ins. Co.*, 229 P.3d 930 (Wash. App. Div. 1 2010) (finding that anti-stacking provision in CGL policy was enforceable so long as it did not violate public policy); *cf. Great Lakes Dredge & Dock Co. v. City of Chicago*, 260 F.3d 789, 793 (7th Cir. 2001) (interpreting Illinois insurance law, and finding that stacking "is not an appropriate response to a single tort that spans multiple policy periods.").

[44] *Mid-Content Casualty Co. v. I&W, Inc.*, 86 F. Supp. 3d 1280  (D.N.M. Feb. 10, 2015).

[45] *See id.* 1291–92.

[46] *Valiant Ins. Co.*, 229 P.3d at 932–33.

[47] *Id.*

[48] *United National Ins. Co. v. Frontier Ins. Co., Inc.*, 99 P.3d 1153, 1157 (Nev. 2004).

[49] *See e.g.* ECF 192-6 at 11 § 11.

which resulted in all of the injuries and damage.'"[50]  Zurich's policy definition closely resembles

Nevada's: "occurrence" is deemed "an accident, including continuous or repeated exposure to

substantially the same general harmful conditions."[51]  And other Nevada courts interpreting similar

definitions of "occurrence" have found the language facially unambiguous.[52]

I find the term "occurrence" in the Zurich policies unambiguous as well.  The anti-stacking

provision itself refers to an "occurrence" and thus effectively reads:

> If this Coverage Form and any other Coverage Form or policy issued
> to you by us or any company affiliated with us apply to the same
> [accident, including continuous or repeated exposure to substantially
> the same general harmful conditions], the maximum Limit of
> Insurance under all the Coverage Forms or policies shall not exceed
> the highest applicable Limit of Insurance under any one Coverage
> Form or policy.[53]

Zurich's anti-stacking policy thus caps recovery for repeated exposure to substantially the same

general harmful conditions.

In urging an ambiguity, United National contends that the anti-stacking policy was "buried"

deep in a large policy, is not referenced elsewhere, and is contradicted by other policy provisions.

Reading the anti-stacking provision in the context of the entire policy—particularly the "limits of

insurance" section[54]—I cannot conclude that it is ambiguous or deliberately hidden.[55]

I also reject United National's argument that the clause undermined R.B. Petersen's

reasonable expectations.  United National argues that if R.B. Petersen's protection was "capped" at a

certain dollar amount, there was no reason for him to continue paying the increasingly expensive

---

[50] *Ins. Corp. of Am. v. Rubin*, 818 P.2d 389, 391 (Nev. 1991) (citations omitted).

[51] ECF 192-6 at 12-13.

[52] *See United Nat. Ins. Co.*, 99 P.3d at 1157 (interpreting definition of "occurrence" in CGL policy that read "an accident, including continuous or repeated exposure to conditions, which results in . . . property damage.").

[53] ECF 192-6 at 11 ¶ 11; ECF 192-10 at 19 ¶ 11; ECF 192-15 at 5 ¶ 11.

[54] *See e.g.* ECF 192-6 at 8 § III(5) (This provision provides that if there is only one "occurrence," the most that will be paid is the "Each Occurrence Limit," which the policy declarations page states is "$1,000,000."  *See e.g.* ECF 192-5 at 24).

[55] *See Vitale*, 5 P.3d at 1057 (noting that judicial re-writing of unambiguous insurance policy language is disfavored).

1   policy premiums.[56]  This argument overlooks the fact that the definition of "occurrence" is

2   sufficiently clear, as well as the reality that when R.B. Petersen contracted for this coverage, he

3   obviously did not know whether he would have to rely on the policy conditions at all.  And because

4   the policy limits of coverage applied "separately to each consecutive annual period,"[57] R.B. Petersen

5   was purchasing protection against additional (and perhaps unrelated) "occurrences" arising during

6   successive policy periods.  That any possible "occurrences" ultimately stemmed from the same

7   "general harmful conditions" was a contingency anticipated by the plain language of the policies.[58]

8   Just because this consequence of the plainly drafted conditions may have come to pass does not, by

9   itself, confound R.B. Petersen's reasonable expectations.

10  **B.     Zurich is not estopped from enforcing its anti-stacking clause.**

11          United National also argues that Zurich should be estopped from enforcing its anti-stacking

12  clause because it waited more than a year after the underlying construction-defect case was filed to

13  reserve its right to deny R.B. Petersen indemnification under two of the three policies.[59]  Insufficient

14  facts have been raised either to support or refute this proposition; at a minimum, whether the ten-

15  month delay in asserting this reservation of rights was reasonable, given that the amount of Zurich's

16  potential liability under the policies may not have been known at the outset of litigation, is a disputed

17  issue of material fact.  Summary judgment on this issue is denied.

18  **C.     The circumstances constitute four occurrences for the purposes of insurance liability.**

19          United National finally asks me to determine the legal meaning of "occurrence" under the

20  facts in this case.  Nevada, like the majority of jurisdictions, has adopted the causal approach "as the

21  analytical framework for deciding whether . . . the circumstances constitute one accident or multiple

22  ─────────────

23  [56] ECF 192 at 9–11.

24  [57] ECF 192-6 at 9; 192-10 at 17; 192-15 at 3.

25  [58] United National argues that Zurich's anti-stacking provision is an unenforceable "escape" clause
    that I should decline to enforce as contrary to public policy.  ECF 192 at 28–29.  However, it points
26  to no controlling case law to establish this point—instead it only points to two opinions from this
    district, both of which have been vacated.  2:05-cv-706-LRH-NJK at ECF 88, 161; 10-1086-JAD-
27  NJK, ECF 71, 187, 195.  Thus, I need not consider whether the reasoning of these opinions is
    applicable here.

28  [59] ECF 192 at 33.

1   accidents for the purposes of insurance liability."[60]   "Under this analysis, the inquiry is focused on

2   whether there was one or more than one cause [that] resulted in all of the injuries or damages."[61]

3   "[T]he focus of the inquiry should not be on the number, magnitude or time of the injuries, but rather

4   on the cause or causes of the injury. . . .   As long as the injuries stem from one proximate cause there

5   is a single occurrence."[62]

6           **1.      *The Nevada Supreme Court's application of the causal approach***

7           The Nevada Supreme Court has applied the causal approach to determine the legal meaning

8   of occurrence in at least three cases.  The first time was in *Ins. Corp. of Am. v. Rubin*,  which arose

9   when a young girl named Brandy went blind after Dr. Rubin failed on five separate occasions to

10  diagnose and timely treat her brain tumor.[63]   The trial court found "that, under the terms of [Dr.

11  Rubin's malpractice] policy, an 'occurrence' took place each time Brandy visited Dr. Rubin's office

12  and was diagnosed."[64]   This finding was based solely on the uncontroverted affidavit of Dr. Rubin,

13  who attested that he had made a "different diagnosis and prescribed a different course of treatment"

14  on each of the "five separate occasions" that he had examined Brandy over a period of nearly one

15  year.[65]   Dr. Rubin also attested that "each time he treated Brandy, he 'made an independent

16  assessment of her condition based on her complaints, history, and the objective results of [his]

17  examination of her.'"[66]   Further, that "he 'did not make a single diagnosis at the beginning of

18  Brandi's [sic] course of treatment and then rely blindly on that diagnosis.'"[67]   On review, the Nevada

19  _____

20  [60] *Bish v. Guaranty Nat. Ins. Co.*, 848 P.2d 1057, 1058 (Nev. 1993); *accord Ins. Corp. of Am. v. Rubin*, 818 P.2d 389 (Nev. 1991) (applying but not expressly adopting the causal approach, referred
21  to as the "cause theory").

    [61] *Bish*, 848 P.2d at 1058 (collecting authorities).
22

23  [62]  *Washoe County v. Transcontinental Ins. Co.*, 878 P.2d 306, 308 (Nev. 1994) (internal quotations omitted) (quoting *Bish*, 848 P.2d at 1058).

24  [63] *Ins. Corp. of Am. v. Rubin*, 818 P.2d 389 (Nev. 1991).

25  [64] *Rubin*, 818 P.2d at 390.

26  [65] *Id.* at 392.

27  [66] *Id.*

28  [67] *Id.*

1   Supreme Court concluded "that the trial court did not err under the widely accepted 'cause theory,'

2   because each diagnosis was a separate 'occurrence' for purposes of the insurance policy limit."[68]

3          The Nevada Supreme Court next applied the causal approach two years later in *Bish v.*

4   *Guaranty Nat. Ins. Co.*[69]  The *Bish* case arose when a woman twice ran over a young girl on

5   sidewalk that was adjacent to the woman's driveway, "first by backing over her, then, after hearing a

6   neighbor scream and realizing what she had done, by putting the car in forward gear and driving over

7   the child again."[70]  The question in *Bish* was whether that tragic incident constituted one or two

8   accidents under an insurance policy issued by Guaranty National.[71]  The Nevada Supreme Court's

9   answer was that the incident was just one accident: although the child was struck twice, her injuries

10  occurred "in a continuous series of events closely linked in time and space."[72]  Expressly adopting

11  and applying the causal approach, the court explained that "The proximity in both time and space of

12  the events at issue, together with their direct interdependence, leads us to the conclusion that there

13  was a single accident, and that the sole cause of the accident was [the driver's] negligence."[73]  Thus,

14  "all of the child's injuries are attributable to one proximate, uninterrupted and continuing cause:  [the

15  driver's] negligence.  Accordingly, [Guaranty National] is liable for just one accident."[74]

16         The Nevada Supreme Court again applied the causal approach one year later in *Washoe*

17  *County v. Transcontinental Ins. Co.* when considering an insurer's liability for Washoe County's

18  alleged negligent licensing and breaching its attendant duties to investigate and monitor the Papoose

19  day-care facility.[75]  A day-care facility employee admitted to sexually abusing numerous children

20  ─────────────────

21  [68] *Id.*

22  [69] *Bish v. Guaranty Nat. Ins. Co.*, 848 P.2d 1057 (Nev. 1993).

23  [70] *Bish*, 848 P.2d at 1057.

24  [71] *Id.*

25  [72] *Id.* at 1059.

26  [73] *Id.*

27  [74] *Id.*

28  [75] *Washoe Cnty. v. Transcontinental Ins. Co.*, 878 P.2d 306 (Nev. 1994).

over a three year period.[76]  The court distinguished the case from *Rubin* (where the doctor had "made

an independent evaluation upon each visit and different symptoms were revealed during each

visit"[77]) and found that each separate instance of molestation arose "from the same proximate cause

vis-a-vis the County: namely, the County's alleged negligence in the process of licensing Papoose."[78]

It thus concluded "that the County's negligence in the licensing process and in its attendant duties to

investigate and monitor Papoose constitutes a single occurrence for purposes of liability."[79]

The *Washoe County* found court analogous the Eleventh Circuit case of *Home Indem. Co. v.*

*City of Mobile*.[80]  In that case, "heavy rain storms on three separate occasions caused overflows at

various points in the city drainage system, resulting in extensive property damage to multiple

property owners."[81]  The trial court found "that what created liability for the city was not the rainfall

and flooding, but the negligence of the city in constructing and maintaining its drainage system,"[82]

and "[t]he Eleventh Circuit agreed, holding that because the intervening negligence of the city in

constructing and maintaining its water drainage system was the cause of the events leading to

Mobile's liability, it was therefore the 'occurrence' for purposes of the city's insurance coverage."[83]

The Nevada Supreme Court noted that the *City of Mobile* court had held that:

> [E]ach discrete act or omission, or series of acts or omissions, which
> caused water to flood and damage properties instead of draining
> properly, was a single occurrence.  **Thus, if on account of the city's
> negligence a drain on one street was blocked so that water flooded
> 10 houses on that street, that would be one occurrence, while a
> drainage block on the other side of the city causing flooding and**

---

[76] *Washoe Cnty.*, 878 P.2d at 307.

[77] *Id.*

[78] *Id.*

[79] *Id.*

[80] *Home Indem. Co. v. City of Mobile*, 749 F.2d 659 (11th Cir. 1984).

[81] 878 P.2d at 310 (citing *City of Mobile*, 749 F.2d at 660–61).

[82] *Id.* (citing *City of Mobile*, 749 F.2d at 661).

[83] *Id.* (citing *City of Mobile*, 749 F.2d at 663).

1    **damage to 100 houses would be another occurrence.**[84]

2    But the Nevada Supreme Court found this "reasoning would not apply" to the *Washoe County* facts

3    because "the County's alleged negligence was directed towards a single institution, and [ ] its

4    negligence cannot be separated out into discrete acts or omissions."[85]

5        **2.**       *Applying Nevada's causal approach to the facts in this case*

6          Both parties agree that Nevada law requires me to look to the proximate cause of the

7    damages when interpreting the legal meaning of occurrence under Zurich's policies.  United National

8    argues that each act or omission R.B. Petersen undertook as part of the work it performed at the

9    Seneca Falls development, e.g., rough grading, over-excavation, importing fill materials, paving,

10   filling, and compacting soils, constitutes a separate cause of damages and thus a separate occurrence

11   under Zurich's policies.[86]  Zurich argues that R.B. Petersen's negligent grading work as a whole at

12   the Seneca Falls development was the singular cause of the damages and thus constitutes just one

13   occurrence under Zurich's policies.[87]  Neither United National nor Zurich is completely correct in its

14   interpretation of occurrence under Nevada's standard and on the record in this case.

15         Zurich is correct that rough grading, over-excavation, importing fill materials, paving, filling,

16   and compacting soils is an interconnected series of acts or omissions by R.B. Petersen that are

17   attendant to or part of the grading and paving work it performed at the Seneca Falls development.

18   Zurich is also correct that the record reflects that those series of acts and omissions are what caused

19   damage to the homes in the Seneca Falls development and created R.B. Petersen's liability for the

20   "scaling and corrosion of various elements of the homes, ponding and drainage problems

21   surrounding the homes[,] and moisture intrusion into the homes."[88]

22         But the record shows R.B. Petersen's negligence was directed toward separate **groups** of

23

24   [84] *Id.* at 804 n. 6 (emphasis added) (citing *City of Mobile*, 749 F.2d at 663).

25   [85] *Id.*

26   [86] ECF 192 at 34.

27   [87] ECF 193 at 47:12–13.

28   [88] ECF 193-21 at 3 ¶ 8; *accord* ECF 192-31 at 3–4 ¶ 6.

homeowners and can be separated into several discrete **series** of acts or omissions just as in *Rubin* and *City of Mobile*: namely, the negligent grading and paving work that R.B. Petersen performed on each one of the four units of the Seneca Falls development.  And, unlike in *Bish*, the record also reflects that R.B. Petersen's separate series of acts or omissions are not closely linked in time or space.

Richard Petersen, president of R.B. Petersen,[89] attested that the subcontractor "did not perform [its] work at Seneca Falls under a contract, but rather w[as] paid by the hour for [its] work."[90]  Scott R. Petersen, who "was the foreman for R.B. Petersen on the Seneca Falls project"[91] and also handled "the bidding, the billing, the building, [and] coordinated the work" for R.B. Petersen,[92] authenticated the subcontractor's documents[93] that show that R.B. Petersen submitted a proposal to work on unit one on February 10, 1999,[94] a proposal to work on unit two on November 14, 2000,[95] a proposal to work on unit three on July 10, 2001,[96] and an invoice for work performed on unit four on February 26, 2002.[97]

According to Scott Petersen, "R.B. Petersen performed" its work on the Seneca Falls development "under the supervision of Heller Development and Acclaim Materials Testing and Inspection, Inc."[98]  Scott Petersen testified that the Seneca Falls development took "years" to

---

[89] ECF 192-29 at 2 ¶ 1.

[90] ECF 192-29 at 3 ¶ 8; *accord*  ECF 192-20 at 16 (pg. 16, lns. 9–21 of transcript).

[91] ECF 192-33 at 3 ¶ 1.

[92] ECF 192-20 at 16 (pg. 15, lns. 14–19 of transcript).

[93] ECF 192-33 at 3 ¶ 3.

[94] ECF 192-33 at 5–7.

[95] ECF 192-33 at 9–10.

[96] ECF 192-33 at 12.

[97] ECF 192-33 at 14.

[98] ECF 192-33 at 3 ¶ 3.

complete and was "done in phases."[99]  Scott Petersen believes the Seneca Falls development was

constructed in "four or five" phases and that each phase took approximately one year to complete.[100]

R.B Petersen could not move onto the next phase, Scott Petersen attested, until R.B. Petersen's

current work had been inspected and approved "by the soils people."[101]  Richard Petersen agrees,

attesting that R.B. Petersen worked:

> with soil, fill and granular material that the general contractor had
> brought in from many different places (from all over Las Vegas) by
> many different people; **we did work in many different phases of the
> project, that each had a different soils report prepared by a
> different company;** we did many different things on the project
> including excavation, grading, compaction, paving and curb work.[102]

The statements by Scott and Richard Petersen show that R.B. Petersen performed grading and

paving work in all four units of the Seneca Falls development and that its work was performed in

four or five distinct phases over several years.  Moreover, that R.B. Petersen's grading and paving

work at the Seneca Falls development was subject to different soils reports and recommendations for

each unit of that development.  Not only are these statements undisputed, they are supported by

declarations that the parties submitted from experts retained by a party in the underlying

construction-defect case—the Seneca Falls Owners Association.[103]

---

[99] ECF 192-20 at 18 (pg. 23, lns. 13–18 of transcript).

[100] *See* ECF 192-20 at 18 (pg. 23–24, lns. 21–6 of transcript).

[101] ECF 192-20 at 19 (pg. 28, lns. 4–14).

[102] ECF 192-29 at 3 ¶ 8 (emphasis added).

[103] Both parties rely on declarations from Salar Dehbozorgi, a civil and geotechnical engineer and owner of New River Engineering, LLC, and whom the Seneca Falls Owners Association retained as an expert in the underlying Seneca Falls case.  *See e.g.* ECF 192-31; ECF 193-21.  Dehbozorgi attests that he "personally reviewed and examined all of the documents, testing, [and] reports related to the construction of the homes and the investigation and destructive testing of the homes."  ECF 193-21 at 3 ¶ 6.  He also "conducted extensive investigations and testing to determine the damages to the project, homes at issue [in the underlying case] and the causes of those damages, including but not limited to the damages caused by Peterson's [sic] grading work."  *Id.* at 3 ¶ 6.  Dehbozorgi attests that R.B. Petersen "was responsible for grading the project to prepare the property to be built upon, including in accordance with approved grading plans, soil reports, and applicable grading ordinances."  *Id.* at 2 ¶ 5; *accord* ECF 192-31 at 3 ¶ 5.  R.B. Petersen's "use of non-compliant and corrosive soils[,]" Dehbozorgi continues, "was an integral part of [R.B. Petersen's] grading work on the project."  ECF 193-21 at 3 ¶ 6.  According to Dehbozorgi, the "actual damages that resulted from Peterson's [sic] improper grading" included "scaling and corrosion of various elements of the homes,

1       The record thus shows that, unlike in *Bish*, construction of the four different units that

2  comprise the Seneca Falls development was separated in time and space.  And, similar to *Rubin*,

3  each unit was subject to a different "diagnosis," i.e., soils report, and a different "treatment," i.e.,

4  recommendations from the geotechnical firms regarding grading and foundation requirements.  I

5  therefore find that the damages to the homes constructed within the Seneca Falls development

6  flowed from four independent causes—the grading and paving work that R.B. Petersen performed in

7  each of the four units of that development.  Accordingly, because the homes constructed in unit one

8  of the Seneca Falls development were, on account of R.B. Petersen's work in that unit, damaged by

9  scaling and corrosion of various elements, ponding and drainage problems, and moisture intrusion,[104]

10  the work performed on unit one constitutes a single occurrence for the purposes of insurance

11  liability.[105]  Further, because R.B. Petersen's work in unit two caused homes constructed within that

---

ponding and drainage problems surrounding the homes and moisture intrusion into the homes."  *Id.* at 3 ¶ 8; *accord* ECF 192-31 at 3–4 ¶ 6.

United National additionally relies on the affidavit of Tom Marsh, a civil and geotechnical engineer and principal engineer for American Geotechnical, whom the Seneca Falls Owners Association retained as an expert in the underlying Seneca Falls case.  ECF 192-32 at 2–3 ¶¶ 1–2.  Marsh attests that, under his direct supervision, American Geotechnical "completed a geotechnical investigation at the" Seneca Falls development.  Marsh continues that he is "knowledgeable in the geotechnical design and earthwork phases of site development and in particular the work performed by the three practicing geotechnical firms that were involved during site development: Southwest Geotechnical Consultants; GeoTek, Inc., and Acclaim Materials Testing & Inspections (AMTI)."  *Id.* at 4 ¶ 5.  According to Marsh, "**[t]he Seneca Falls development consists of four units" and "[s]ite grading was performed in several phases during the timeframe between 1999 and 2002**."  *Id.* at at 4 ¶ 7 (emphasis added).  "Recommendations for Units I and II" regarding size and expansiveness of fill soils to be used "were included in the . . . report [prepared] by Southwest Consultants dated December 8, 1998."  *Id.* at 7 ¶ 18.  And "[r]ecommendations regarding post-tension slab design were given in [a] . . . letter by Southwest dated January 5, 1999."  *Id.*  "The recommendations for post-tension slabs originally provided by Southwest Consultants were reduced by GeoTek, Inc. within Unit I" in a report dated "March 7, 2000."  *Id.* at 8 ¶ 21.  "Recommendations for Unit III were originally provided by GeoTek, Inc. in [a] . . . report dated December 4, 2000."  *Id.* at 9 ¶ 24.  And "[p]ad certification reports for Unit III were provided by AMTI" on "July 2, 2001, August 16, 2001, and October 23, 2001."  *Id.* at 11 ¶ 28.  While "[r]ecommendations for Unit IV were provided by AMTI in [a] . . . report dated March 20, 2001."  *Id.* at 9 ¶ 24.  And "[p]ad certification reports for Unit IV were provided by AMTI" in "2002."  *Id.* at 13–14 ¶ 34.

[104] *See* ECF 193-21 at 3 ¶ 8; *accord* ECF 192-31 at 3–4 ¶ 6.

[105] *See City of Mobile*, 749 F.2d at 663.  Unlike the case before me where a settlement has already been reached regarding R.B. Petersen's alleged liability, there had been neither a settlement nor a determination of negligence or liability against the city of Mobile for flood damages when the Eleventh Circuit decided *City of Mobile*.

1   unit to be damaged, that is a second, separate "occurrence."  As the homes constructed within unit

2   three suffered damage as a result of R.B. Petersen's work in that unit, this constitutes a third

3   "occurrence," and this subcontractor's work on unit four is a fourth distinct "occurrence" for the

4   purposes of insurance liability.

5
6   **D.      Summary judgment remains unavailable because the record does not reflect when the property damage occurred.**

7         My conclusion that there were four occurrences for the purposes of insurance liability,

8   however, does not automatically entitle United National to summary judgment in its favor on any of

9   its claims or on Zurich's 13th affirmative defense asserting its anti-stacking provision.  Zurich's

10  policies plainly provide that the insurance applies to "property damage" only if "it is caused by an

11  'occurrence' that takes place in the 'coverage territory'" **and the "'property damage' occurs**

12  **during the policy period**."[106]  Summary judgment is not warranted at this juncture because United

13  National has not met its burden to demonstrate that the "property damage" occurred between the

14  relevant dates of Zurich's policies—July 31, 2000–July 31, 2003.  Although the parties submitted

15  evidence in the form of expert opinions showing that the homes constructed in the Seneca Falls

16  development did suffer from "property damage"—a physical, tangible injury like the alteration in

17  appearance, shape, color, or other material dimension[107]—as a result of R.B. Petersen's work, neither

18  party has established *when* that property damage occurred.

19  . . .

20

21  . . .

22

23  . . .

24

25

26  [106] *See e.g.* ECF 192-5 at 35 § I(1)(b) (emphasis added) (policy covering July 31, 2000–July
27  31,2002).

28  [107] *See United Nat. Ins. Co.*, 99 P.3d at 1159 (citing to decision from the Supreme Court of Illinois describing physical, tangible injury as altering the "appearance, shape, color or in other material dimension").

1

**Conclusion**

2       Accordingly, it is HEREBY ORDERED that United National's motion for summary

3  judgment **[ECF 192] is DENIED**.

4       This case is referred to a Magistrate Judge to schedule a mandatory settlement conference.

5       Dated this 12th day of November, 2015.

6

7  _____

8  Jennifer A. Dorsey
   United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28